# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
BARROSO, INC., doing business  .    Civil Action No. 1:20cv632
as Guajillo Mexican Cuisine,   .
                               .
            Plaintiff,         .
                               .
     vs.                       .    Alexandria, Virginia
                               .    November 10, 2020
TWIN CITY FIRE INSURANCE       .    11:59 a.m.
COMPANY,                       .
                               .
            Defendant.         .
                               .
.   .   .   .   .   .   .   .   .   .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE
(Via Teleconference)

<u>APPEARANCES</u>: (by telephone)

FOR THE PLAINTIFF:              CHRISTOPHER L. LaFON, ESQ.
                                The Veritas Law Firm
                                1225 19th Street, N.W.
                                Suite 320
                                Washington, D.C. 20036


FOR THE DEFENDANT:              SARAH D. GORDON, ESQ.
                                Steptoe & Johnson LLP
                                1330 Connecticut Avenue, N.W.
                                Washington, D.C. 20036


OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                U.S. District Court, Third Floor
                                401 Courthouse Square
                                Alexandria, VA 22314
                                (703)299-8595


(Pages 1 - 17)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1                    P R O C E E D I N G S

2            THE COURT:  All right, counsel, this is the matter of

3    Barroso, Inc., doing business as Guajillo Mexican Cuisine,

4    versus Twin City Fire Insurance Company, et al., Civil Action

5    20cv632.  Do we have counsel there for the plaintiff?

6            MR. LaFON:  Yes, Your Honor.  Chris LaFon on behalf

7    of the plaintiff, Guajillo.

8            THE COURT:  Good morning, Mr. LaFon.

9            And how about for the defendant?

10           MS. GORDON:  Good afternoon, Your Honor.  Sarah

11   Gordon on behalf of the defendant, Twin City Fire Insurance

12   Company.

13           THE COURT:  All right.  Now, we are on the record

14   with my court reporter, but obviously, we can't see you,

15   although since I have a male and a female, we shouldn't have

16   any problem knowing who's speaking.  You'll be the only two

17   speakers today.

18           Before we get started, though, Mr. LaFon, I want to

19   clear up one matter with you, and that is, you named as an

20   additional defendant in this case the Commonwealth of Virginia,

21   and that technically would destroy diversity, and this is not a

22   federal case.  My understanding is you've never served the

23   defendant, and I don't think the defendant has entered -- that

24   defendant has entered any appearance.

25           When the case was removed from state court, the

1   insurance company represented that this was basically a

2   fraudulent joinder.  We always have to determine our

3   jurisdiction first, so I want to make sure, is it correct that

4   you're not pursuing the commonwealth in this case?

5           MR. LaFON:  Yes, Your Honor.  Once it was removed, we

6   believe this Court can adequately handle these matters and

7   wanted to proceed as quickly as possible.

8           THE COURT:  All right.  Then we're going to go ahead

9   and formally dismiss the commonwealth out of this -- out of

10  this case.  That does mean we clearly have proper diversity --

11  sorry, we have proper jurisdiction now because there is not --

12  there is not a problem with diversity.

13          All right.  And then, Mr. LaFon, as you know, both

14  sides have filed motions for summary judgment, the plaintiff

15  requesting partial summary judgment on the issue of coverage,

16  and the defendant has asked for summary judgment or moved for

17  summary judgment on the entire case.

18          In looking at the pleadings, it's my understanding

19  that there really is no dispute about the facts, that this case

20  boils down to an interpretation of the relevant insurance

21  contract.  Do either -- does either side disagree with that

22  description of the situation?  Mr. LaFon?

23          MR. LaFON:  No, I don't think there is an issue of

24  fact here, Your Honor.  I do believe that depending on what is

25  argued today, there could be an issue with respect to perhaps

1  the issue of whether there was any type of COVID infection or

2  contamination at the restaurant, but from my understanding,

3  that's not being something that is contentious at this point.

4           THE COURT:  Well, my understanding is that there has

5  not been any representation or allegation that the virus itself

6  was ever in the premises; that is, there's no evidence in this

7  record of any employee or customer becoming -- showing positive

8  for the virus.

9           Are you disputing that?

10          MR. LaFON:  No, Your Honor.  That's correct.  I, I

11 assume that Twin City is also not disputing that, but I just

12 wanted to make that small representation that that is being --

13 that it's not, I do not believe there is an issue of fact

14 regarding that.

15          THE COURT:  All right.  Well, Ms. Gordon, again, as I

16 read the pleadings, it did not appear as though there's any

17 fact that the sides are disputing.  Is that a correct

18 description of your understanding?

19          MS. GORDON:  Your Honor, from our perspective, there

20 is absolutely no factual dispute with respect to coverage, but

21 we obviously have not addressed any damages, related issues, to

22 the extent there is a finding of coverage.  So -- but there are

23 no facts with respect to coverage.  That is our view.

24          THE COURT:  All right.  And that's, of course, the

25 core issue today.  I mean, if the Court finds -- grants your

1  motion for summary judgment, effectively the Court is finding
2  that there's no coverage, so we never would reach the damages
3  issue.

4          MS. GORDON:  Exactly.

5          THE COURT:  Yeah, all right.

6          Well, Mr. LaFon, I must tell you I think you've got
7  an uphill battle here.  The vast majority of the case law, in
8  my view, is definitely and unfortunately tipped against you,
9  but as you know, this particular insurance policy has what I
10  think is a very clear virus exclusion, and I think you have to
11  really address that issue because I think that is the primary,
12  core issue in this particular case.

13          MR. LaFON:  Certainly, Your Honor.  Yes, the limited
14  coverage endorsement does contain some exclusionary language
15  which I know that Twin City is relying on.  Here I think there
16  are two issues regarding applicability.

17          First, I believe that all facts that are understood
18  and which this Court could take judicial notice support that
19  the government orders are what is the predominant and proximate
20  cause of the business -- loss of business income here, that
21  there were COVID infections before and after and certainly now
22  more than ever, and it was not those infections, even if COVID
23  is considered a virus, that led to the partial suspension of
24  operations at the restaurant, not allowing basically the core
25  function of it, the table seating and bar seating and service.

1          So for that reason, we don't believe here that the

2    virus is a cause of the business income loss, and that the

3    causal chain doesn't extend back to, to when this virus began

4    or when people were being infected in the area, but a

5    determination by government, which is -- has been different in

6    almost every state regarding the actions that were taken by

7    government, and that that order is what caused the loss here.

8          We're not seeking losses of income due to people not

9    frequenting restaurants -- not frequenting this restaurant

10   before or after, or perhaps now, when things are, you know,

11   seemingly even worse for us, but just that limited period of

12   time in which the government had ordered the prohibition of

13   table and bar seated service.

14         We also note that in the endorsement providing

15   limited coverage, that it does provide limited coverage with an

16   exception regarding civil commotion as well as a part of -- the

17   first part of the endorsement beginning on Part A stating that

18   part of the endorsement only applies to increased costs of

19   construction and additional coverage, and that only excludes

20   coverage for costs associated with an enforcement or an

21   ordinance or law which requires insured or others to, among

22   other things, contain, neutralize, or respond or assess the

23   effects of viruses, and with that, if that would go to what we

24   are talking about here, and yet that coverage was only excluded

25   with respect to increased costs of construction and not with

1    respect to general loss of business income.

2           THE COURT:  But, you know, I mean, the defendant has

3    argued, I think, very strongly that if you just read the

4    language of the endorsement -- and, of course, we have to read

5    the insurance policy, you know, word for word -- it says that

6    they will not pay for loss or damage caused directly or

7    indirectly by, and then they talk about the virus.

8           Now, their argument is that you would not have --

9    that these orders from the governor would not exist but for the

10   presence of the virus, and the orders themselves recite, as did

11   the general orders here for the Court when we reduced our

12   operations, there are recitations about the presence of the

13   virus circulating in society and the need to reduce the

14   potential for a broad spread of the virus.

15          So I don't know how you can actually argue that

16   the -- even if it's the governor's -- and I agree with you,

17   it's the governor's orders that are the immediate cause of your

18   injury, but those orders only issued because of the virus, and

19   so when you have the word "indirectly," how do you get around

20   the fact that the virus is not the indirect cause of your loss

21   or damage?

22          MR. LaFON:  Your Honor, with respect to the

23   anti-concurrent language, there were no Virginia cases that I

24   could determine, and both sides, Twin City as well, that

25   discussed the situation of the anti-concurrent language being

1    applied in the situation where there weren't two types of

2    actions that were causing a loss.

3         Here, I don't think that it is the virus -- well, we

4    are arguing that the virus here -- obviously, it -- there is

5    the Corona virus.  It began infecting the population.  But

6    these government orders were decisions by the state, and then

7    that is what caused the actual prohibition here, and when those

8    ended, the restaurant began opening back up despite the

9    presence of the virus.

10        And so even if they were related to trying to stop

11   the spread of COVID, that was a proximate and predominant

12   action that caused the loss here.  Even if there was the virus

13   within society at that point, that here, that basically the

14   causation doesn't go back, doesn't go back to China.  It starts

15   at the point at which it, the restaurant had to shut down part

16   of its operations, and that only began at the time in which the

17   governor issued the orders.

18        THE COURT:  All right.  Ms. Gordon, do you want to

19   respond?

20        MS. GORDON:  Yes, thank you, Your Honor.  I, I think

21   Mr. LaFon's position was a little divorced from reality.  The

22   only reason we have these orders is because of a virus.  And

23   the policy not only says directly or indirectly; it says such

24   loss or damage is excluded regardless of any other cause or

25   events that contributes concurrently or in any sequence to

1 loss.

2          So even assuming the virus is just one of the causes

3 and the orders are the main cause here, taking Mr. LaFon at his

4 word here, the virus exclusion still applied, and Mr. LaFon

5 does nothing to refute the numerous cases we've listed in our

6 motion for summary judgment -- I'm looking at page 17 of

7 doc. 23, carries on to the next page -- showing that Virginia

8 courts routinely enforce these anti-concurrent causation

9 clauses.

10          But more to the point, I mean, there has been a

11 mountain -- a chorus of opinions nationwide rejecting the exact

12 argument Mr. LaFon is making here.  The, the argument has been

13 rejected by a number of courts.  One court in California called

14 it nonsense.

15          You can't separate the governmental orders from the

16 virus that precipitated them, and four courts have already

17 interpreted this exact exclusion for Hartford-related

18 affiliates and found it barred COVID-19 claims, just like the

19 law says here.  Those cases we've submitted either with our

20 briefing or supplemental because of the timing, but that's the

21 *Wilson* case, the *Founder* case, the *Franklin* case, and the

22 *Nahmad* case.

23          And besides those four that address this exact

24 exclusion, by my count, approximately 18 other courts applying

25 similar other exclusions have dismissed and found because the

1    exclusions apply.

2          There's just -- I can't think of a situation more on

3    all fours with the virus exclusion than the present pandemic.

4    The virus is what is causing his loss.  The only way to get

5    around the virus exclusion would be to fit into an exception,

6    and they don't do that here.

7          THE COURT:  All right, Mr. LaFon?  Because I think --

8    I mean, frankly, although there are other arguments here that I

9    think are, are well stated by the defense as well in terms of,

10   you know, direct physical loss and -- but I don't even think we

11   have to get to that in this case because it's so clear in the

12   Court's view that the virus exception, which you've really not

13   been able to articulate a decent argument against, it just

14   prevails.  There is no case law that really favors your

15   position.

16         MR. LaFON:  Your Honor, the other point which I don't

17   think I at least clarified here, and I understand the Court's

18   position, are -- although the case law is in its infancy there,

19   have been, frankly, a minority, but some courts have determined

20   that at least the motion to dismiss stage, that coverage was

21   possible under policies, particularly one that we have supplied

22   the Court that did include a virus endorsement similar to here.

23         We also argued that as an exception to the exclusion

24   here is that the virus, if that is found to be what is the

25   cause of the loss, that there is an exception to that involving

1    a virus that is being spread through civil commotion.

2            Here, that is, frankly, what the government was -- if

3    it's deemed to be related to the viruses, that the government's

4    orders related to regarding a spread of COVID-19, and, and the

5    civil commotion that, frankly, was occurring because people

6    were, you know, not adhering to distancing rules and not

7    adhering to rules that was allowing this to spread, that we

8    believe that that would result in the exception being fulfilled

9    to the exclusion here in even though such limited, limited

10   times in which this actual limited coverage endorsement would

11   provide any coverage, which would be a spread of a virus or

12   bacteria or fungi through these certain limited things, but

13   here we've argued that the civil commotion exception would

14   allow basically the coverage to be possible even with respect

15   to the exclusion if applicable.

16           THE COURT:  Well, when you articulated that in your

17   briefs, though, didn't you make a reference to the, the civil

18   commotion surrounding the death of George Floyd and that you

19   were trying to argue that that commotion was sort of the

20   impetus for the governor's orders?  And, of course, as has been

21   pointed out, the governor's orders were two months before that

22   event, so that couldn't possibly have been the impetus for it.

23           But I don't recall in reading the governor's orders

24   any discussion about civil commotion.  Civil commotion, you'd

25   have to really find something in the language.  I mean, if the

1  governor were to say, you know, people are not abiding by, by

2  the law and we have unrest in the streets and we have all this

3  commotion, and as a result, the virus is spreading, you know,

4  you might have an argument, but that's not what those orders

5  say.

6         MR. LaFON:  Right, Your Honor.  The orders,

7  particularly the beginning ones, don't spell out the discussion

8  of civil commotion, but they do speak to keeping people inside,

9  and they continued orders that were in place to do so, and then

10  there have been at least reports through media, media that have

11  articulated that those weren't being adhered to and causing the

12  potential spread of infection of the virus, and that's what we

13  relied on, not, not with respect to protests that occurred

14  after George Floyd's death, but those that were occurring

15  during the early stages and during the time in which the

16  governor's prohibition on the table seated service were in

17  place.

18         THE COURT:  Well, I think you're stretching the

19  word "civil commotion" way beyond its normal meaning.

20         And, Ms. Gordon, do you want to respond to that?

21  Because I don't, I don't think that's how you articulate it in

22  your briefs.

23         MS. GORDON:  I do, and thank you for the opportunity.

24  The first is with respect to the case Mr. LaFon first pointed

25  to, the Florida *Urogynecology* case, you know, that case is

1   obviously different procedurally.  It was a motion to dismiss,

2   not a motion for summary judgment, which we've done at

3   Barroso's request here, but, you know, that court and that

4   decision was based on a misunderstanding about whether the

5   policy was in the record.  It actually was.

6           And two courts after that decision have found it not

7   persuasive.  The court in *Founder* expressly stated the district

8   court in *Urogynecology* didn't cite anything in the complaint or

9   elsewhere that would support a conclusion that the business

10  shutdown due to a pandemic falls outside the scope of the virus

11  exclusion.

12          So, frankly, you know, in the approximately seven

13  weeks since it was decided, no one has relied on it, and, in

14  fact, numerous other courts have gone the other way.

15          With respect to the limited coverage, I think Barroso

16  is wrong on, on all fronts.  The Barroso -- for the limited

17  coverage to apply, you have to have two things here.  The first

18  is you have to have a virus that is the result of a specified

19  cause of loss, and the second is you have to have direct

20  physical loss or damage to cover property because of a virus.

21          Now, they can't meet either of those.  I'll talk

22  first about the civil commotion because that's what the Court

23  and Mr. LaFon was addressing, but I'm happy to talk about the

24  second element as well.

25          So the specified cause of loss which was talked about

1    that he identified is civil commotion, but if you read the

2    papers, they never say that civil commotion resulted in virus.

3    What they say, and I'm looking at doc. 18, page 35, they say

4    the civil commotion "resulted in the continued mandates

5    concerning the prohibition on dine-in and seated restaurant

6    service and public gatherings."

7            That by the plain terms of the policy doesn't meet

8    the limited coverage first requirement.  The virus has to be

9    the result of the civil commotion, and they don't say it's the

10   virus that's the result of the civil commotion.  That's not

11   their argument in any way.

12           Secondly, as Your Honor pointed out, I think they're

13   stretching civil commotions far beyond reasonable

14   interpretation and beyond what courts have said civil commotion

15   means, which we've cited in our papers and I won't repeat here.

16           And third, this is just a moving target for them.  At

17   first they said it was the George Floyd -- resulting activities

18   from the death of George Floyd that were the civil commotion,

19   but when we pointed out those were two months later, they said,

20   oh, actually it was people violating governmental mandates and

21   reentering the public in ways that would spread the virus, and

22   that also, of course, came after the virus had been in Virginia

23   and after their restaurant had been shut down.  They're just

24   trying to squeeze themselves as a square peg here into a round

25   hole, and they don't fit.

1          You know, I'd also note that what he's talked about a

2     lot is the spread of the virus, but nowhere does the limited

3     coverage say the spread of the virus is the result of a civil

4     commotion, and I'm quoting here from the limited coverage,

5     which is on page 159 of doc. 17.  It says:  "The coverage

6     described . . . below only applies when the 'fungi,' wet or dry

7     rot, bacteria or virus is the result of one or more of the

8     following causes that occurs during the policy period," and it

9     goes on from there, and one or more of the following causes is,

10    "A 'specified cause of loss' other than fire or lightning."

11         So the virus has to be the result of civil commotion.

12    So they don't even allege, let alone prove, at the summary

13    judgment stage that the virus is the result of a civil

14    commotion.

15         And then as I started, sort of the -- the limited

16    coverage has two elements.  The first is one we just talked

17    about, what is the virus a result of, and the second is direct

18    physical loss or damage to covered property from the virus, and

19    they don't allege that, and they don't prove that either.  In

20    fact, they concede in the Juarez declaration expressly that

21    nothing physical at all happened to their property.

22         THE COURT:  All right.  Just so we complete the

23    record, Mr. LaFon, do you want to respond to that last argument

24    about there being no evidence in this record of a direct

25    physical loss?

1          MR. LaFON:  Your Honor, with respect to the direct

2     physical loss, only addressing it with respect to the limited

3     exception to the exclusion here, we had articulated that at

4     least that direct physical loss was the loss that was caused by

5     the governor's orders.

6          You know, to the extent that those are found to be

7     caused by the virus, then the orders in this sense would also

8     be caused by the virus, and thus resulting in the direct

9     physical loss of the usability of the tables and chairs and bar

10    in the restaurant.

11         THE COURT:  Okay.  Well, I think you can see from the

12    way the argument is going, I mean, I'm more than satisfied

13    that, number one, there are no material facts in dispute here;

14    and number two, that the overwhelming authority supports the

15    defendant's position, that under the specific language of this

16    insurance contract and in particular the very, in my view,

17    clear exclusion for injuries that are the result, either

18    directly or indirectly, of a virus, means that your client is

19    not covered by this insurance contract.  So I'm granting

20    summary judgment for the defendant.

21         And I want to thank both of you for signing in, and

22    hopefully you both will stay safe.  But thank you.  We'll get

23    an order out to you today.

24         MR. LaFON:  Thank you, Your Honor.

25         THE COURT:  All right.

1          MR. LaFON:  Please be safe as well.

2          THE COURT:  All right, goodbye.

3          MS. GORDON:  Thank you.

4                          (Which were all the proceedings

5                           had at this time.)

6

7                  CERTIFICATE OF THE REPORTER

8       I certify that the foregoing is a correct transcript of

9  the record of proceedings in the above-entitled matter.

10

11

12          _____/s/_____

13                          Anneliese J. Thomson

14

15

16

17

18

19

20

21

22

23

24

25