IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAQ WILLOW GROVE, LLC,  *Plaintiff,* | : : : | CIVIL ACTION |
| v. | : : | No. 20-3863 |
| TWIN CITY FIRE INSURANCE,  *Defendant.* | : : | |

**MEMORANDUM**

**Kenney, J.**                                                                                     **January 14, 2021**

      Like many Pennsylvania restaurants, Plaintiff TAQ Willow Grove, LLC ("TAQ") was forced to close its doors in March 2020 due to shutdown orders issued by the Governor of Pennsylvania in response to the COVID-19 pandemic. TAQ suffered business income losses and sought indemnity from its insurance carrier, Twin City Fire Insurance Company ("Twin City") under its business owner's property policy ("Policy"). Twin City denied TAQ's claims.

      TAQ then brought this action in the Court of Common Pleas of Philadelphia County. Twin City removed the action under our diversity jurisdiction and now moves to dismiss the Amended Complaint for failure to state a claim, arguing TAQ's losses are not covered by the terms of its Policy. TAQ opposes the motion. Having considered Twin City's Motion, TAQ's response in opposition, and Twin City's reply, we will grant Twin City's Motion because TAQ's claims are not covered by the terms of its Policy.

**I.        Factual and Procedural Background**[1]

---

[1] We "accept as true all allegations in plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and construe[] them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). We draw the following facts from the Complaint and the attached exhibits. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complaint's claims are based upon these documents.").

TAQ Willow Grove, LLC operated Sweet Taco,[2] a full-service restaurant in Willow Grove, Pennsylvania. Am. Compl., ECF No. 7, ¶ 2; ECF No.[3] Twin City issued a Spectrum Business Owner's Policy to TAQ for its restaurant that provided property, business personal property, business income, extra expenses and other coverage through September 26, 2020. *Id.* ¶¶ 9–15; ECF No. 10-2, Ex. A.

On March 6, 2020, Pennsylvania Governor Tom Wolf issued a Proclamation of Disaster Emergency. *See* Am. Compl. ¶ 19. Governor Wolf issued another order on March 19, 2020 requiring all restaurants and bars to suspend dine-in services statewide. *See* Order of the Governor of the Commonwealth of Pennsylvania regarding the Closure of All Businesses that are not Life Sustaining (Mar. 19, 2020). The March 19, 2020 Order noted that "[a]ll restaurants and bars previously have been ordered to close their dine-in facilities" and ordered that "[b]usinesses that offer carry-out, delivery, and drive-through and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons." Am. Compl. ¶ 21. On March 23, 2020, TAQ timely filed a claim to its insurer for its losses, which Twin City denied on May 20, 2020. *Id.* ¶¶ 27, 28.

---

[2] Plaintiff does not allege the name of the restaurant it operated at its insured location, but the Policy appended to TAQ's Complaint filed in the Court of Common Pleas identifies the restaurant as Sweet Taco. ECF No. 1-1 Ex. A at 30. A Google search for "Sweet Taco Willow Grove" suggests the restaurant has permanently closed its doors.

[3] "[T]he citizenship of an LLC is determined by the citizenship of its members." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010). In its Notice of Removal, Defendant asserts "[u]pon information and belief, Plaintiff's sole member is Chris Blythe…Blythe is a citizen of New Jersey. Therefore, Plaintiff is a citizen of New Jersey" ECF No. 1 ¶ 7. Plaintiff did not allege the citizenship of its member, asserting only that it is a business organization registered in Pennsylvania. Am. Compl. ¶ 2. Even so, diversity of citizenship exists between Plaintiff and Defendant whether Plaintiff is a citizen of New Jersey or of Pennsylvania. Plaintiff alleges Defendant is "located in Connecticut," Am. Compl. ¶ 3, and Defendant's Notice of Removal clarifies that it is incorporated in Indiana and has its principal place of business in Connecticut. ECF No. 1 ¶ 9.

After Twin City denied TAQ's claim for coverage, TAQ filed this action in the Court of Common Pleas of Philadelphia County seeking a declaration that its business losses were covered under 42 PA. CONS. STAT. § 7532, and a claim for breach of contract. Compl., ECF No. 1-1 Ex. A, ¶¶ 22–27, 28–32. Twin City filed a Notice of Removal on August 7, 2020, removing the case to this Court on the basis of diversity jurisdiction. *See* ECF No. 1. Twin City moved to dismiss TAQ's Complaint on August 14, 2020. ECF No. 5. Two weeks later, TAQ filed an Amended Complaint, *see* ECF No. 7, to which Twin City responded with the instant motion to dismiss. *See* ECF No. 10.

**II.      Standard of Review**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010)) (internal quotation marks omitted). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) we "must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;' " (2) we "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;' " and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675).

In ruling on a motion to dismiss, we may "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Guidotti v. Legal Helpers Debt Resolution*, L.L.C., 716 F.3d 764, 772 (3d Cir. 2013)).

### III.     Discussion

The issue before us is one of contract interpretation. The interpretation of an insurance contract is a question of law. *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011). We must interpret the plain language of the insurance contract read in its entirety, giving effect to all its provisions. *Id.* We are to construe the words of the policy "in their natural, plain, and ordinary sense" meaning. *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999).

When the policy language is "clear and unambiguous," we must "give effect to that language." *401 Fourth Street v. Inv'rs Ins. Co.*, 879 A.2d 166, 170 (Pa. 2005). When policy language is ambiguous, we are to construe the provision against the insurer and in favor of the insured. *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 677 (3d Cir. 2016). A policy is ambiguous where it is reasonably susceptible to more than one construction and interpretation. *Madison Const. Co.*, 735 A.2d at 106. Policy language may not be stretched beyond its plain language to create an ambiguity. *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d Cir. 2011). Mere disagreement between the parties about the meaning does not make the policy language ambiguous. *Id*.

The guiding principle in interpreting an insurance contract is to effectuate the reasonable expectations of the insured. *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 903 (3d Cir. 1997) (citations omitted). Under Pennsylvania law, even if the terms of the insurance contract are clear and unambiguous, the insured's reasonable expectations may prevail over the express terms of the

contract. *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994). Even so, the insurance contract's language itself serves as the best evidence of the parties' reasonable expectations. *Safe Auto Ins. Co. v. Berlin*, 991 A.2d 327, 332 (Pa. Super. 2010) (citation omitted).

As the insured, TAQ has the initial burden of establishing coverage under the policy. *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009). Where the insured meets that burden and the insurer relies on a policy exclusion as the basis for denying coverage, the insurer then has the burden of proving that the exclusion applies. *Id*.

### A.     Coverage

TAQ asserts coverage under the business income, extra expense, and civil authority provisions of the policy. Am. Compl. ¶¶ 29–46. Twin City contends that TAQ has no covered loss under those provisions and relies on the virus exclusion as a basis for denying coverage. *See* ECF No. 10-1.  Arguing that TAQ's losses fall squarely within the Policy's virus exclusion, Twin City asserts that the exclusion bars coverage. *Id.* at 7–15.

Pennsylvania law requires that we first determine whether TAQ has met its burden of establishing coverage under the business income, extra expense or civil authority provisions before considering whether the virus exclusion applies. *State Farm*, 589 F.3d at 111. Under the Policy, Twin City "will pay for direct physical loss of or physical damage to Covered Property at the premises... caused by or resulting from a Covered Cause of Loss." Policy, Form SS 00 07 07 05, at p. 1 of 25. The Policy defines "Covered Cause of Loss" as used in the quoted provisions as "RISKS OF DIRECT PHYSICAL LOSS" unless otherwise excluded from coverage or limited by another provision. *Id.* at 2 of 45 (all caps in original).

The Policy's additional coverage for Business Income states:

> [Twin City] will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must

> be caused by direct physical loss of or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", caused by or resulting from a Covered Cause of Loss.

*Id.* at 10 of 25. The Policy further provides:

> We will pay reasonable and necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or physical damage to property at the "scheduled premises"…caused by or resulting from a Covered Cause of Loss.

*Id.* The Policy defines "operations" and "period of restoration." "Operations" means, in part, the "business activities occurring at the [insured property]." *Id.* at p. 24 of 25. "Period of restoration" means, in part, "the period of time that begins with the date of the direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss at the [insured property]" ending on either the date when the property "should be repaired, rebuilt, or replaced with reasonable speed and similar quality" or "[t]he date when business is resumed at a new permanent location." *Id.* TAQ's Policy also includes a provision governing covered losses flowing from actions of a "civil authority":

> This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises".
>
> The coverage for Business Income will begin 72 hours after the order of a civil authority and coverage will end at the earlier of:
>
> (a) When access is permitted to your "scheduled premises"; or
>
> (b) 30 consecutive days after the order of the civil authority.

*Id*. at 11 of 25. The business income and extra expense coverage are triggered when there is a suspension of TAQ's operations caused by direct physical loss of or damage to its insured properties. Its civil authority provision applies when a civil authority issues an order prohibiting access "as the direct result of a Covered Cause of Loss [defined as 'risks of direct physical loss']."

The coverages share essential elements. Both business income and extra expense coverage is predicated on damage to property. The business income provision requires the suspension of operations caused by "direct physical loss of or damage to property" of the insured, while the extra expense provision covers costs incurred as a result of "direct physical loss or physical damage to property." Each coverage also depends on the existence of a "covered cause of loss" as defined in the policy. The civil authority coverage applies only when the damage to other property that instigated the government order was caused by a "covered cause of loss." Likewise, the business income coverage and extra expense coverage apply when operations are suspended as a result of loss or damage caused by a "covered cause of loss."

### 1. Loss of or Damage to Property

The Policy's business income and extra expense provisions apply when business losses are caused by "direct physical loss of or damage to property" of the insured. The parties' dispute comes down to the meaning of "direct physical loss of or physical damage to…property" and whether TAQ has sufficiently alleged such loss or damage. Our Court of Appeals' precedent is instructive here. In *Port Authority of New York and New Jersey*, the Court addressed whether the presence of asbestos in a building constituted "direct physical loss of or damage to" property under New Jersey law. *Port Auth. of N.Y. & N.J. v. Affiliated MF Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002). It explained that "[i]n ordinary parlance and widely accepted definition, physical damage to property means distinct, demonstrable, and physical alteration of its structure." *Id.* (quoting 10 Couch on Ins. § 148:46 (3d ed. 1998)). Damage by sources unnoticeable to the naked eye must "meet a higher threshold" than "typical examples of physical damage from an outside source that may demonstrably alter the components of a building." *Id*. at 235.

The plaintiff alleging physical loss or damage "by sources unnoticeable to the naked eye" bears the burden of establishing its structure was physically damaged by "meet[ing] a higher threshold." *Id.* at 232, 235. In *Port Authority*, our Court of Appeals determined that asbestos causes physical loss or damage if it is present in such large quantities that it makes the structure "uninhabitable and unusable." *Id.* at 236. If, however, the structure continues to function and remains usable then the building owner has not suffered a loss. *Id.* at 236. The "mere presence of asbestos, or the general threat of future damage from that presence, lacks the distinct and demonstrable character necessary for first-party insurance coverage." *Id*. The test proposed by *Port Authority* is consistent with Pennsylvania law. *See Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826 (3d Cir. 2005) (finding an issue of material fact existed as to whether a house's functionality was nearly eliminated or destroyed, or made useless or uninhabitable, by the presence of e coli in a well).

We agree with and adopt our sister court's conclusion that, "under Pennsylvania law, for Plaintiffs to assert an economic loss resulting from their inability to operate their premises as intended within the coverage of the Policy's 'physical loss' provision, the loss and the bar to operation from which it results must bear a causal relationship to some *physical condition* of the premises." *4431, Inc. et al v. Cincinnati Ins. Cos.*, No. 5:20-cv-04396, 2020 WL 7075318, at *11 (E.D. Pa. Dec. 3, 2020) (emphasis in original). There must also be an "element correlating to [the] extent of operational utility – i.e., a premises must be uninhabitable and unusable, or nearly as such." *Id*; *see also Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, No. CV 20-3198, ⸺ F.Supp.3d ⸺, 2020 WL 6545893, at *3 (E.D. Pa. Nov. 6, 2020) (finding *Port Authority* and *Hardinger* preclude a finding of "direct physical loss of or damage to" property where it remained inhabitable and usable, albeit in limited ways). In sum, while structural damage is not required to show "direct

physical loss of" or damage to property, the source that destroys, or nearly destroys, the property's utility must have something to do with the physical condition of the premises, whether existing or imminently.

We now look to TAQ's Amended Complaint to determine whether well-pleaded facts show alleged damage or losses that "bear some causal connection to the physical condition of the premises" and whether those conditions "operate[d] to completely or near completely preclude operation of the premises as intended." 4431, Inc., 2020 WL 7075318, at *10. In its response, TAQ argues that as a result of the Civil Authority Orders, its property was "rendered unusable for its intended purpose," satisfying the Policy's requirement that its insured property suffered "direct physical loss of" and "damage to property." ECF No. 12-2 at 21; Am. Compl. ¶ 23.

Even assuming that the Civil Authority Orders completely barred TAQ and its customers from entering the insured property—which they did not—TAQ's alleged loss bears no causal connection to the physical condition of its premises. TAQ argues that *Friends of Danny Devito v. Wolf* is "instructive" on the meaning of "direct physical loss of" and "damage to property" and permits its interpretation. *See* 227 A.3d 872 (Pa. 2020). In *Danny Devito*, the Pennsylvania Supreme Court found that the COVID-19 pandemic qualifies as a natural disaster under a statute that defines natural disasters as events that result in "substantial damage to property, hardship, suffering or possible loss of life." *Id*. According to TAQ, *Danny Devito* "stands for the proposition that COVID-19 is capable of causing damage to property…" Pl. Br. in Opp., ECF No. 12-2 at 23. TAQ argues that *Danny Devito* supports the conclusion that property damage can occur even if COVID-19 was not present on the insured property.

TAQ's reliance on *Danny Devito* is misplaced. First, the Pennsylvania Supreme Court did not hold that COVID-19 causes property damage. It held that COVID-19 is a natural disaster that

triggers the Governor's executive authority because the pandemic "is unquestionably a catastrophe that 'results in . . . hardship, suffering or possible loss of life.'" *Devito*, 227 A.3d at 888 (ellipses in original) (quoting 35 Pa. Cons. Stat. § 7102). Second, *Danny Devito* has nothing to do with property insurance. Thus, the Pennsylvania Supreme Court's discussion of a statute triggering executive authority for various natural disasters has no bearing on how we are to construe the plain language of an insurance contract.

TAQ's Amended Complaint lacks any allegations about the existence of anything affecting the physical condition of its premises. Thus, its losses are a loss of use untethered from the physical condition of the property itself. Further, a reading of "direct physical loss of or damage to property" that contemplates mere loss of use is not a reasonable interpretation because it renders two other Policy provisions unnecessary or nonsensical.

First, TAQ's proposed reading creates discord between the business income and associated provisions and the Civil Authority coverage provision. If mere loss of use is a "direct physical loss of or damage to property" then a government order barring access to a property or mandating its closure would already trigger business income or extra expense coverage. There would be no need for a separate Civil Authority provision granting coverage when civil authority orders bar access to premises under more limited circumstances.

Second, mere loss of use counting as "direct physical loss of" property makes no sense when read with the "period of restoration" language. Business Income and Extra Expense coverage is only provided during the period of restoration, defined in part as the time that begins "with the date of direct physical loss or damage" and ends on the earlier of the date when the property is either "repaired, rebuilt or replaced" or when "business is resumed at a new permanent location." Policy, Form SS 00 07 07 05, at p. 24 of 25. Built into coverage for business income

and extra expense coverage then, is the idea that there must be something to repair, rebuild, or replace—none of which exists for mere loss of use untethered to a physical condition of the property. *See Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 332 (S.D.N.Y. 2014) ("The words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it.").

Finally, no order by any authority required TAQ to close completely. Instead, per Governor Wolf's March 19 Order, TAQ could remain open to provide "carry-out, delivery, and drive-through and beverage service…so long as social distancing and other mitigation measures are employed to protect workers and patrons." Am. Compl. ¶ 21. Thus, TAQ's property remained inhabitable and usable, albeit in limited ways. *See Handel*, 2020 WL 6545893 at *3 (finding that plaintiff failed to allege "direct physical loss of or damage to" property where it remained inhabitable and usable, albeit in limited ways). TAQ made no allegations as to whether it offered carry-out or delivery services, but that it could have done so indicates that its insured property continued to function and remained usable. Thus, under *Port Authority* and *Hardinger*, TAQ has not pleaded plausible facts that COVID-19 caused damage or loss in any physical way to the property so as to trigger coverage under its business income or extra expense provisions.

### 2. Covered Cause of Loss

TAQ's Policy defines a covered cause of loss as a risk of "direct physical loss" unless the loss is excluded or limited. Policy, Form SS 00 07 07 05, at p. 2 of 25. TAQ does not explicitly argue that the Governor's Orders were a covered cause of loss, but argues that the Civil Authority Orders prohibited access to their property, thus causing a loss that triggers coverage under the civil authority provision. Pl. Br. in Opp., ECF No. 12-2 at 37–40.

To trigger coverage under the civil authority provision, a covered cause of loss must damage another property in the immediate area of the insured property, prompting a civil authority to respond to the covered cause of loss. The policy requires that the insured be prohibited from accessing the property. Policy, Form SS 00 07 07 05, at p. 11 of 25. Twin City argues that TAQ is not entitled to coverage under the civil authority provision because it does not allege harm to property or that it was completely barred from accessing its insured property, and because the Civil Authority Orders were issued to mitigate the spread of COVID-19 rather than property damage. Mot. to Dism., ECF No. 10-1 at 27–28. TAQ refutes all three arguments. *See* Pl. Br. in Opp., ECF No. 12-2 at 37–40. First, TAQ argues that its Amended Complaint permits the inference that surrounding properties suffered harm, again relying on *Danny Devito*. *Id.* at 37–38. This argument fails. As we explained with regards to alleged harm to TAQ's insured property, the surrounding properties likewise suffered a loss of use that is untethered to the physical condition of the properties themselves and therefore cannot constitute a covered cause of loss.

Next, TAQ argues that the relevant issue in determining coverage under the civil authority provision is "whether a complete prohibition of access to a portion of the premises is sufficient to find coverage," and argues that the term "prohibit" as used in its policy is ambiguous. TAQ argues that its policy requires access be "specifically prohibited" and Twin City could have chosen to include—but did not—language requiring a complete and total prohibition of access because it did choose to add the word "specifically" to its Policy. We disagree and resist TAQ's attempts to reach beyond the Policy's plain language to create an ambiguity. *See Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d Cir. 2011). That TAQ could have provided carry-out and/or delivery services at its insured property under the Civil Authority Orders reveals that a prohibition on access to the properties—a prerequisite to coverage under its policy—is absent here and precludes coverage

under the civil authority provision. *See Handel*, 2020 WL 6545893, at *3 ("[P]laintiff's property remained inhabitable and usable, albeit in limited ways.).

Finally, TAQ refutes Twin City's argument that it is not entitled to civil authority coverage because the civil authority orders were intended to prevent the future spread of COVID-19 as opposed to being issued to respond to past property damage. It argues "the orders recognized the current and ongoing existence of a dangerous physical condition and were predicated on hard scientific evidence demonstrating the certainty of future harm rather than mere fear." Pls. Br. in Opp., ECF No. 12-2 at 33. While we agree that the orders were intended to address future harm, we disagree that the orders were issued in response to a "dangerous physical condition" of the property. The civil authorities issued their orders to address the health crisis, not some "direct physical loss" as required by TAQ's policy. *See, e.g.*, "Proclamation of Disaster Emergency," Governor Wolf, Commonwealth of Pennsylvania (March 6, 2020) (stating that it is critical "to implement measures to mitigate the spread of COVID-19").

TAQ has not plausibly alleged a direct physical loss, and without a direct physical loss, there can be no coverage. We recognize that courts in other jurisdictions have either found coverage under similar policies or allowed cases to survive motions to dismiss. But upon review of those non-binding cases, TAQ's Policy, and relevant caselaw from our Court of Appeals, we find that TAQ has not met its burden to show coverage under its Policy. In the absence of coverage, it cannot sustain a breach of contract claim under Pennsylvania law. *See Toner v. GEICO Ins. Co.*, 262 F. Supp. 3d 200, 204 (E.D. Pa. 2017) (quotation omitted) ("Under Pennsylvania law, a breach of contract claim requires that a plaintiff establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.").

**B.     Virus Exclusion**

Even if TAQ had suffered covered losses under the civil authority, business income or extra expense provisions, the Policy's virus exclusion precludes coverage. The Policy contains a virus exclusion providing "[w]e will not pay for loss or damage caused directly or indirectly by any of the following… (1) Presence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus." Policy, Form SS 40 93 07 05, at p. 1 of 3. The exclusion applies "regardless of any other cause or event that contributes concurrently or in any sequence to the loss" and "whether or not the loss event results in widespread damage or affects a substantial area." *Id*.

TAQ first argues that we may not consider the virus exclusion at this stage of litigation. We disagree. Courts routinely grant motions to dismiss when an exclusion provision in an insurance policy applies to the action. *See Brewer v. U.S. Fire Ins. Co.*, 446 F. App'x 506, 510 (3d Cir. 2011); *see also Handel*, 2020 WL 6545893 at *3, *Wilson v. Hartford Cas. Co.*, Civil Action No. 20-3384, ⸺ F.Supp.3d ⸺, 2020 WL 5820800, at *7 (E.D. Pa. Sept. 30, 2020).

Pointing to the exclusion's language which excludes losses "caused directly or indirectly by" a virus, TAQ next argues the virus exclusion applies only to exclude damages caused by a virus. Pls. Br. in Opp. ECF No. 12-2 at 37–38. The exclusion does not apply to exclude the damages TAQ alleges it suffered as a result of the Civil Authority orders. *Id.* This effort to circumvent the virus exclusion fails.

As we have explained, the civil authority provision applies only when another property is damaged by a covered cause of loss. As TAQ's amended complaint alleges, the virus damaged properties surrounding TAQ's insured property, which caused the civil authorities to issue their orders mitigating its spread. *See* Am. Compl. ¶ 24. If so, the cause of the insureds' losses was COVID-19, which is excluded as a covered cause of loss by the virus exclusion. Even if the Civil

Authority orders had caused TAQ's losses, as we have discussed, civil authority orders are not a covered cause of loss.

TAQ alternatively argues that the virus exclusion is ambiguous, and discovery is needed to ascertain the intent of the exclusion. However, a Third Circuit panel has upheld a similarly unambiguous exclusion barring coverage for losses caused by hazardous substances or microorganisms. *See, e.g.*, *Certain Underwriters at Lloyds of London Subscribing to Policy No. SMP3791 v. Creagh*, 563 F. App'x 209, 211 (3d Cir. 2014) (applying microorganism exclusion to bacteria). And, our sister court recently upheld a virus exclusion identical to this Policy's as unambiguous in the context of losses caused by COVID-19. *See Wilson*, 2020 WL 5820800, at *7 ("[Insurer] will not pay for loss or damage caused directly or indirectly by ... [p]resence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus."). There, Judge Robreno noted that several Pennsylvania courts have also "enforced similar exclusions as unambiguous." *Id* (collecting cases).[4]

Finally, TAQ makes a regulatory estoppel argument, and urges us to deny Twin City's motion to dismiss because issues of fact relating to its regulatory estoppel claims so require. Pls. Br. in Opp., ECF No. 12-2 at 40–44. Regulatory estoppel "prohibits parties from switching legal positions to suit their own ends." *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 566 Pa. 494, 781 A.2d 1189, 1192 (2001). If an insurer represented to a regulatory agency that new language in a policy would not result in decreased coverage, the insurer cannot assert the opposite position when

---

[4] *See also LH Dining L.L.C v. Admiral Indemnity Company*, 2:20-cv-01869-TJS (Dec. 18, 2020); *Newchops Restaurant Comcast v. Admiral Indemnity Co.*, 2:20-cv-01949-TJS (Dec. 17, 2020); *Kessler Dental Associates P.C. v. Dentists Insurance Company*, 2:20-cv-03376-JDW (Dec. 07, 2020); *Toppers Salon & Health Spa, Inc. v. Travelers Property Casualty Company of America*, 2:20-cv-03342-JDW (Nov. 30, 2020); *Brian Handel DMD PC v Allstate Insurance Company*, 2:20-cv-03198 (Nov. 06, 2020).

insureds raise the issue in litigation. *Hussey Copper, Ltd. v. Arrowood Indem. Co.*, 391 F. App'x 207, 211 (3d Cir. 2010).

To establish regulatory estoppel, TAQ must allege that the opposing party made a statement to a regulatory agency and later adopted a position contrary to the one presented to the regulatory agency. *Simon Wrecking Co. v. AIU Ins. Co.*, 541 F. Supp. 2d 714, 717 (E.D. Pa. 2008). TAQ asserts that it meets the first element of a regulatory estoppel claim because it alleges a statement made to a regulatory agency. Pl. Br. in Opp. ECF No. 12-2, 41–42. TAQ's amended complaint alleges that the Insurance Services Office ("ISO") made representations "on behalf of insurers" that "property policies have not been a source of recovery for losses involving contamination by disease-causing agents" to gain initial regulatory approval for the Virus Exclusion. Am. Compl. ¶ 43.

TAQ's amended complaint fails to allege facts meeting the first element of regulatory estoppel. TAQ failed to aver that Twin City itself made any statements, or that the ISO, when presenting its case to state regulatory agencies, made the alleged statement on Twin City's behalf. *See Handel*, 2020 WL 6545893, at *4 (finding that Plaintiff satisfied the first element where it averred that ISO and American Association of Insurance Services presented to state regulatory agencies in 2006 on behalf of multiple insurers, including defendant, to include a virus exclusion in insurance policies).[5]

Even if the ISO's alleged statement could be imputed to Twin City, TAQ has not alleged that Twin City is now contradicting the statements the ISO made to state regulatory bodies. TAQ

---

[5] In its response, TAQ argues that its amended complaint alleges that the ISO made the statement on Twin City's behalf. We do not read that paragraph in the amended complaint ("the Insurance Services Office, Inc., *on behalf of insurers* represented that, 'property policies have not been a source of recovery for losses involving contamination by disease-causing agents.'") (emphasis added) as alleging that the "ISO was making such representation on behalf of Defendant" as Plaintiff claims. ECF No. 12-2 at 42. "On behalf of insurers" does not equate to "on behalf of Defendant."

cites the ISO's statement where it made clear that property policies have not been a source of recovery for damage from disease-causing agents such as a virus. *See* Am. Compl. ¶ 43 ("[P]roperty policies have not been a source of recovery for losses involving contamination by disease-causing agents"). Twin City takes the same stance here by arguing that the Policy's virus exclusion precludes coverage for any damage or loss caused "directly or indirectly by…activity of…[the] virus." Policy, Form SS 40 93 07 05, at p. 1 of 3; *see also Newchops Rest. Comcast LLC v. Admiral Indem. Co.*, No. 20-1869, 2020 WL 7395153, at *10 (E.D. Pa. Dec. 17, 2020); *Kessler v. Dentists' Ins. Co.*, 2020 WL 7181057, at *3 (E.D. Pa. Dec. 7, 2020); *Handel*, 2020 WL 6545893, at *5. As TAQ has not pleaded facts to satisfy the requisite elements, the doctrine of regulatory estoppel does not apply to this action. TAQ has not stated a claim for regulatory estoppel.

   **C.** **Leave to Amend**

  We are to grant leave to amend where justice so requires. Fed. R. Civ. P. 15(a)(2). Where leave to amend would be futile, denial of leave to amend is appropriate. *See Kanter v. Barella*, 489 F.3d 170, 181 (3d Cir. 2007). We will not grant TAQ leave to amend its amended complaint because TAQ cannot allege any facts related to its Policy, its losses, or the reasons for its losses that could bring its claim within the coverage of its insurance policy.

**IV.** **Conclusion**

  For the foregoing reasons, TAQ is not entitled to coverage for the losses it suffered. Its claims for declaratory relief and its breach of contract claim will be dismissed with prejudice.